# United States Court of Appeals for the Fifth Circuit

United States Courts
Southern District of Texas
FILED
*November 12, 2025*
Nathan Ochsner, Clerk of Court

No. 24-20235

United States Court of Appeals
Fifth Circuit
**FILED**
October 21, 2025
Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

LARRY ODELL LEWIS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CR-260-1

Before KING, SMITH, and DOUGLAS, *Circuit Judges*.

KING, *Circuit Judge*:

A jury convicted Larry Odell Lewis of sex trafficking for forcing or coercing four women he pimped to engage in commercial sex. On appeal, Lewis contends that the district court erred on four grounds: (1) denial of his motion for judgment of acquittal as to five counts when there was insufficient evidence to support those convictions; (2) denial of his motion for a mistrial or to strike the testimony of two government witnesses due to the destruction

of evidence in violation of *Brady*[1] and the Jencks Act;[2] (3) admission of improper testimony; and (4) admission of unauthenticated and prejudicial Instagram posts. For the following reasons, we AFFIRM.

## I. Background

In February 2023, Lewis was charged with four counts of sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2), (b)(1) & 2 ("Sex Trafficking"), and four counts of coercing or enticing prostitution in violation of 18 U.S.C. § 2422(a) ("Coercion and Enticement").[3] Each count relates to one of four victims he pimped over various, overlapping timeframes: T.A.: January 2014–March 2015; B.E.: January 2014–July 2014; K.B.: March 2014–December 2014; S.W.: June 2016–December 2017.

### A. Dispute about Deleted Text Messages

Just before trial, the government disclosed text messages that Amanda Clemmons, an investigator for the Harris County District Attorney's Office, had exchanged with two of the victims, B.E. and T.A. The defense received all of Clemmons's messages with B.E., but only the last two months—August to September 2023—of Clemmons's messages with T.A., indicating that about two years of messages with T.A. were missing. The defense moved for a mistrial or, in the alternative, to exclude the testimony of Clemmons, B.E., and T.A., arguing that the recently disclosed messages showed

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] 18 U.S.C. § 3500.

[3] Lewis was originally indicted on June 2, 2022. On February 8, 2023, the government filed a superseding indictment adding the charges related to one of the victims, K.B. Lewis was also charged with two more counts related to a fifth victim that were dismissed before trial.

Clemmons manipulated B.E. and tainted her memory and that the deleted messages might show Clemmons did the same with T.A.

The district court addressed the motion on the second day of trial in the absence of the jury. The government explained that the defense had just recently requested the text messages, and that Clemmons had deleted the text messages because T.A. got a new number so she did not want to accidentally text the wrong number. The government further represented that Clemmons messaged the victims "to keep the rapport going," that T.A. reached out for help with drug use, and that much of this "was about facilitating resources and help to the victims." The defense argued that it was evident from the messages they *did* receive—including one in which Clemmons sent a picture of another victim who could allegedly corroborate B.E.'s story—that the messages discussed substantive issues in the case and could be psychologically manipulative. The government responded that Clemmons sent the "photo of a victim to another victim" at the government's direction, because it "needed to corroborate" by "pass[ing] a photo to them and [asking] do you recognize this person."

The district court had T.A. take the stand, confirmed she had gotten a new number, and learned she still had the old phone in her hotel room. The court concluded that it would let T.A. testify, and "we'll just try and find the old text messages." T.A. later returned with her old phone and testified, again outside the presence of the jury, that she could not locate the messages. At the court's direction, she pulled up Facebook messages between Clemmons and her going back two weeks, which counsel was permitted to review.

The district court revisited its ruling the next day, when the defense renewed the motion and added that Clemmons had not deleted messages with another witness who had also gotten a new number. Clemmons took the stand outside the presence of the jury, and the defense was permitted to

question her. Clemmons testified that she started communicating with T.A. around 2021, that she deleted the messages when T.A. got a new number, that she had never been asked for messages so did not think anything of it, that the messages discussed the case, and that she attempted to recover them by taking her phone to her digital forensic unit. The district court denied the motion.

## B. Evidence at Trial

### *1. Victim Testimony*

The government presented testimony from each of the four victims. T.A. testified that she was "trafficked by a pimp" in California from the age of 16 until her rescue by law enforcement at the age of 18. She made her way to Houston with nothing but her identification, where she met Lewis at a motel and began working for him—"[s]elling sex for money"—around 2014.

B.E. testified that she was about 24 years old and homeless when she was introduced to Lewis and T.A. in a hotel in Lafeyette, Louisiana. Lewis did not say much but put B.E. into a hotel room, where she had sex for money with people Lewis told her would be "coming by." The three departed for Houston the next day, and B.E. thought "it was going to be one big happy thing."

K.B. testified that she started working for Lewis after another pimp left her in jail for five days. She explained that she went to Lewis because he had been nice to her and helped her leave the other pimp without consequences.

S.W. met Lewis in 2016 after engaging in sex work without a pimp in the same area for several months. Lewis told her she could come work for him, and she explained that it "can be dangerous" without a pimp for

protection. She ultimately decided to work for him after getting out of jail, thinking she "was going to be the only one" working for him.

The four victims presented similar accounts of their time with Lewis. They generally picked up clients by posting online advertisements and walking Houston's Bissonnet Street. They gave Lewis all the money they earned, and Lewis booked the hotel rooms, kept the hotel keys, and provided food, supplies, and gift cards to purchase the online ads. T.A. and B.E. added that Lewis took their identification. Each victim testified about drug use during this period, and most explained that Lewis supplied and withheld drugs. B.E. testified that Lewis would "tell us we need to do another date before we can get more money or before we can get anything [even] when we just did two or three." Each also testified to traveling out of state with Lewis to engage in commercial sex.

The victims each recounted times Lewis physically abused them. T.A. testified that she went on dates she did not want to go on because otherwise she "would get in trouble," meaning Lewis "would hit [them]." The women answered questions about why they stayed with or returned to Lewis, even after he beat them. T.A. testified that she worked for him for about a year because "that's all [she] had." B.E. once left Lewis but returned for "clean clothes, a room, food, drugs." K.B. testified that she did not "have anywhere else to go." She did not blame Lewis and felt "really guilty" for testifying, because she "was already in the lifestyle" of "pimping, prostitution, having a pimp." S.W. testified that she once left after Lewis beat her up but returned because he was supplying her drugs.

### *2. Law Enforcement Witnesses*

The government also presented seven law enforcement witnesses, including Clemmons and Texas Department of Public Safety (TDPS) Lieutenant Sam Larson. Clemmons testified about her investigation, specifically

about her interviews with the victims, over various objections from the defense. In turn, she answered questions from the defense about her communications with the witnesses, connecting B.E. and T.A. with advocates and gifting T.A. baby items and a breast pump, as well as creating a baby registry for T.A. that she shared among her personal friends.

The defense questioned Clemmons about the deleted messages with T.A. Clemmons admitted she messaged witnesses about evidence in the case but denied that the deleted texts contained any evidence. She explained the texts contained "pictures that the Government wanted [her] to show to the victims to see if they recognized the girls," and messages "checking up on [T.A.], seeing how she was, checking on needs, a variety." The defense then questioned Clemmons about why she told B.E. "that another witness corroborated her story," and Clemmons agreed that "those are types of things that could influence one's memory."

Larson testified about his investigation, his interviews with the victims, and his efforts to identify Lewis's Instagram account, over objections from the defense.

#### *3. Documentary Evidence*

The documentary evidence included online advertisements, a photo of K.B. with bruises from Lewis, photos of S.W. with injuries from Lewis, screenshots of Lewis's Instagram that T.A. had saved, and Instagram posts Larson obtained from Meta through a search warrant.

### C. Closing and Post-Trial

The defense moved for a judgment of acquittal after the government rested. The court denied the motion. On day six of the trial, the parties delivered closing arguments, and the jury returned a verdict of guilty on all counts except the Coercion and Enticement count involving S.W.

At sentencing, the defense raised their post-trial motions for acquittal and new trial. The defense again argued that the failure to turn over the deleted text messages violated *Brady* and the Jencks Act, stressing that T.A.'s story had changed over the years and therefore the messages were important—potentially exculpatory—impeachment evidence. The district court denied the motions, and sentenced Lewis to 480 months' imprisonment, within the advisory guidelines range.

## II. Analysis

### A. Sufficiency of the Evidence

Lewis argues that the district court erred in denying his motion for acquittal on the Sex Trafficking counts involving K.B., S.W., and B.E., and the Coercion and Enticement counts involving K.B. and B.E. Because Lewis properly preserved the issue by moving for a judgment of acquittal at the close of the government's (and all) evidence, "we review his evidentiary sufficiency contentions *de novo*." *United States v. Fulton*, 928 F.3d 429, 438 (5th Cir. 2019). "[W]e review all evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Harris*, 740 F.3d 956, 962 (5th Cir. 2014) (quoting *United States v. Shum*, 496 F.3d 390, 391 (5th Cir. 2007)). "In determining whether there is sufficient evidence to support a verdict, 'this court asks only whether the jury's decision was rational, not whether it was correct.'" *United States v. Lewis*, 774 F.3d 837, 841 (5th Cir. 2014) (quoting *United States v. Rodriguez*, 553 F.3d 380, 389 (5th Cir. 2008)).

#### *1. Sex Trafficking Counts*

Lewis challenges the Sex Trafficking counts involving K.B., B.E., and S.W. on the theory that the "evidence was insufficient to show that

Lewis caused these women to engage in sex work." He points to selective portions of the victim's testimony, including their prior and subsequent prostitution history. In particular, Lewis highlights S.W.'s testimony that she thought she was "manipulating" Lewis, and response that she was "already prostituting" when asked whether Lewis forced her. Lewis also attributes the instances of physical abuse to unrelated personal disputes, arguing that the evidence of physical abuse, by itself, cannot sustain the convictions because there is no nexus between the force used against the women and the sex work.

The Sex Trafficking counts require the government to prove that Lewis (1) knowingly (2) "in or affecting interstate or foreign commerce" (3) "recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited by any means a person" (4) knowing, or in reckless disregard of the fact (5) "that means of force, threats of force, fraud, coercion . . . or any combination of such means would be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a) (citation modified).

"Coercion" includes "threats of serious harm to or physical restraint against any person," and "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." *Id.* § 1591(e)(2). And the statute defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity [to] avoid incurring that harm." *Id.* § 1591(e)(5).

Lewis's arguments ignore much of K.B., B.E., and S.W.'s testimony from which a jury could reasonably find that Lewis forced or coerced

them to engage in commercial sex acts. K.B. testified that she did not leave even when he beat her only because she did not "have anywhere else to go"; nor could she, since she gave him all the money she earned and asked for food when hungry. Indeed, she testified that she "could only imagine" the consequences if she was caught keeping money; and Lewis "chose to let [her] walk away" only when she threatened to "scream bloody murder so that the police would come" after he beat her and broke her ribs. S.W. also testified that Lewis forced her into prostitution with him by beating her and taking her to hotels. And B.E. testified that Lewis took her wallet with her identification and told her she "belonged to him," such that she thought she "had to earn it back."

The women's history of sex work does not negate this evidence. *See United States v. Bell*, 761 F.3d 900, 909 (8th Cir. 2014) (explaining "prostitution histories of these women do not preclude" a conviction because "the evidence shows" that "they did not want to be *his* prostitutes").

Furthermore, Lewis's argument that the physical abuse was too removed from the sex work to sustain the conviction is both factually and legally flawed. Factually, at least one incident of physical abuse *was* directly related to sex work—Lewis broke K.B.'s ribs after she fell asleep and did not answer his calls when she "should have been working." Legally, the text of the statute supports much broader theories of coercion and force. *See* 18 U.S.C. § 1591(e)(2). As the government persuasively points out, such a "direct cause-and-effect connection" is not required; a rational juror could conclude Lewis's violence was part of a plan to coerce his victims to engage in commercial sex for his benefit.[4]

[4] Examples of Lewis's violence against the victims include S.W.'s testimony that she returned to Lewis—even after he beat her—because he was supplying her drugs, and that Lewis hit her for "entertaining another pimp" and hiding money. B.E. testified that

Accordingly, the evidence supports that Lewis was physically abusive to all three women and controlled their access to money, food, and drugs. We have suggested similar evidence supports a Sex Trafficking conviction where the defendant beat one victim, hit a "victim because she was leaving him," choked a victim for "talking to other guys," and "emotionally and financially manipulated the victims so as to support a finding of coercion." *Fulton*, 928 F.3d at 438. And other circuits have upheld convictions on comparable evidence.[5] *See, e.g.*, *McIntyre*, 612 F. App'x at 79–80 (finding sufficient evidence where women were beaten by defendant or present when he beat others who worked for him, were "strictly controlled by [defendant], even as to their purchases or necessities such as food, and . . . continued to engage in prostitution from him despite their fear for him"). In sum, a reasonable juror could find that Lewis knowingly forced or coerced K.B., B.E. and S.W. to engage in commercial sex acts.

---

she complied with Lewis's request to sleep with him to "make up" for not seeing a client who was physically hurting her, Lewis kicked her (which busted her lip) for being on her phone, split her head open because she "must have said something," and whipped her with a computer cord after she returned from Florida for taking "his car and his main bitch."

[5] *See also Bell*, 761 F.3d at 909 (finding sufficient evidence where defendant "physically assaulted at least one of the prostitutes, threatened the physical well-being of several others and their families, made false promises and statements to induce their compliance, and coerced them into committing these acts for his profit"); *United States v. Walker*, 73 F.4th 915, 931 (11th Cir. 2023) (finding sufficient evidence where "a reasonable jury could view the evidence as showing that [defendant] intended [victim] to believe that, if she did not engage in sex work, she was at risk of (1) losing her lodging in Miami, (2) continuing to go hungry, and (3) remaining stuck in an unfamiliar city hundreds of miles from her home and family"); *United States v. Fuertes*, 805 F.3d 485, 502 (4th Cir. 2015) (finding sufficient evidence that defendant "knew or recklessly disregarded that [victim] was coerced or forced into prostitution" where defendant witnessed someone else beating the victim); *United States v. Wysinger*, 64 F.4th 207, 212 (4th Cir.), *cert. denied*, 144 S. Ct. 175 (2023) (finding sufficient evidence where defendant "gave the women heroin and then posted advertisements for them on a prostitution website because they 'owed him money' for the heroin they consumed . . . [t]he women performed[,] and the cycle continued").

### *2. Coercion and Enticement Counts*

Lewis also challenges the coercion and enticement counts involving K.B. and B.E. on the theory that the evidence was insufficient to show that Lewis caused these women to travel interstate to engage in sex work.

The Coercion and Enticement counts require the government to prove that Lewis (1) knowingly (2) "persuaded, induced, enticed, or coerced any individual" (3) "to travel in interstate or foreign commerce" (4) "to engage in prostitution." 18 U.S.C. § 2422(a) (citation modified). "The words 'attempt,' 'persuade,' 'induce,' 'entice,' or 'coerce,' though not defined in the statute, are words of common usage that have plain and ordinary meanings." *United States v. Kelly*, 128 F.4th 387, 413 (2d Cir. 2025) (quoting *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007)), *cert. denied*, 145 S. Ct. 2820 (2025).

We established above that the evidence was sufficient to show Lewis coerced the women to engage in commercial sex under § 1591's definition of coercion. *See* 18 U.S.C. § 1519(e). That same evidence is sufficient to establish that Lewis knowingly persuaded, induced, or enticed K.B. and B.E. to engage in commercial sex under this statute's relatively lower standard. As to the crossing of state lines, B.E.'s testimony reflects that when they first met in Louisiana, Lewis put her in a hotel room and made her aware that she was expected to have sex for money with the people "coming by [her] room." He then took her wallet, which contained her identification, her social security card, and her shot records, and told her she "belonged to him." After a day or two in Louisiana, B.E. traveled to Texas with Lewis and T.A. K.B. testified she traveled from Texas to Louisiana with Lewis for sex work.

In sum, the evidence is sufficient to support Lewis's conviction for the Sex Trafficking counts involving K.B., S.W., and B.E., and the Coercion and Enticement counts involving K.B. and B.E.

### B. Deleted Text Messages

Lewis argues that the government violated both *Brady* and the Jencks Act by not disclosing the deleted text messages between Clemmons and T.A. The government counters that Lewis cannot show the text messages were important enough to satisfy either standard, because the messages were cumulative of other impeachment evidence produced.

Although the witnesses testified to the content of the deleted messages, Lewis's theory is that "[t]he absence of text messages prevented [him] from being able to effectively challenge the credibility of these witnesses on cross-examination." He contends the deleted messages included (1) "discussions about Lewis and about [T.A.'s] experience with him," and (2) "discussions between the government and [T.A.] about 'resources' Clemmons provided to T.A."[6]

As to the messages about T.A.'s experience, Lewis explains that he was not able to effectively impeach T.A. without the messages, which "likely contradicted her testimony at trial." As to the messages about resources Clemmons provided, Lewis argues he was able to confirm "the gift exchange through cross-examination" but was unable to show context without the texts, allowing the government to defend Clemmons at closing. In support of the materiality of the messages, Lewis argues this was a "close case," and "the witnesses had significant credibility problems."

---

[6] Lewis also contends the messages show "[T.A.] contacted Clemmons 'for help in situations that she found herself regarding drug use or . . . trouble she was in.'" T.A. testified that she "relapsed" since her initial interview, so any incremental impeachment value would be trivial.

### 1. *Brady*

We review a claim that the government violated *Brady de novo*, with "deference to the factual findings underlying the district court's decision." *United States v. Brown*, 650 F.3d 581, 289 (5th Cir. 2011) (quoting *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004)).

"To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016) (explaining "*Giglio* applies *Brady* to evidence affecting the credibility of key government witnesses"). "Evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Brown*, 650 F.3d at 588 (citation modified) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Stated differently, the favorable evidence must 'put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Glenn*, 935 F.3d 313, 319 (5th Cir. 2019) (quoting *Banks v. Dretke*, 540 U.S. 668, 698 (2004)). "We have explained that 'when the undisclosed evidence is merely cumulative of other evidence in the record,' such as 'when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable,' it is not material." *United States v. Brumfield*, 89 F.4th 506, 514–15 (5th Cir. 2023) (quoting *Sipe*, 388 F.3d at 478, 489), *cert. denied*, 145 S. Ct. 244 (2024).

Assuming arguendo that the deleted text messages would have been favorable impeachment evidence, Lewis failed to show they were material. *See Glenn*, 935 F.3d at 319 (finding no *Brady* violation because there was "little likelihood that the overwritten data would have changed the outcome of this case, even assuming it had some exculpatory or impeachment value").

To the extent the messages suggest T.A. changed her story, the defense was able to both question T.A. in front of the jury about her first interview with Clemmons and attempt to impeach T.A. on changing her story since that interview. The defense also questioned Clemmons both about her communications with the witnesses, and about the deleted messages. As to the benefits, T.A. and Clemmons acknowledged the gifts and resources T.A. received leading up to the trial. In sum, the deleted text messages are "merely cumulative" of the impeachment testimony the defense was able to elicit.

Additionally, T.A.'s testimony was corroborated by the testimony of B.E., K.B., and S.W., all of whom provided similar accounts of their time with Lewis, further supporting that the text messages were immaterial. *See Sipe*, 388 F.3d at 478 ("[W]hen the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material."). Given the testimony elicited on the same subjects and the evidence corroborating T.A.'s story, the incremental impeachment value the messages may have provided does not support a reasonable probability of a different outcome. *See, e.g.*, *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) (finding "vague assertions" including an "inability to effectively cross-examine the government's witness" do not show "a reasonable probability that such evidence affected the outcome of the trial"). Therefore, Lewis cannot establish a *Brady* violation because the deleted messages were not material.

### *2. Jencks Act*[7]

The Jencks Act requires the government to provide the defendant with any "statement" by a government witness "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500. A "statement" includes "a written statement made by said witness and signed or otherwise adopted or approved by him." *Id.* § 3500(e)(1).

"Jencks Act sanctions should be imposed in cases of bad faith and negligent suppression of evidence but not in the case of good faith loss by the government." *Moore*, 452 F.3d at 389. In the context of unpreserved or destroyed evidence, "[t]his [c]ourt has instructed the district courts to 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.'" *Id.* (quoting *Ramirez*, 174 F.3d at 589). "Even where a violation of the Jencks Act is found, the failure to produce prior statements is subject to harmless error analysis." *United States v. Montgomery*, 210 F.3d 446, 451 (5th Cir. 2000). "We strictly apply harmless error analysis and determine whether the error itself had a substantial influence on the judgment in addition to determining whether there was sufficient evidence to support the conviction." *Id.* "We review a district court's decision concerning an alleged Jencks Act violation for clear error." *Id.*

We need not decide whether there was a Jencks Act violation because even if there was, such error was harmless for the same reasons the messages are not material under *Brady*. *See United States v. Brown*, 303 F.3d 582, 592

---

[7] Lewis also frames this argument as a violation of Federal Rule of Criminal Procedure 16. While he correctly states that Rule 16 "does not authorize 'the discovery or inspection on statements made by prospective government witnesses except as provided'" in the Jencks Act, he does not mention the rule further in his discussion. Accordingly, we address only the potential Jencks Act violation.

(5th Cir. 2002) (holding that even if the district court violated the Jencks Act, such error was harmless for the same reasons the *Brady* argument failed). Thus, we reject Lewis's argument on this issue.

### C. Improperly Admitted Testimony

Lewis argues that the district court erred by admitting expert testimony that impermissibly bolstered the victims' testimony or that impermissibly went beyond the scope because it equated "pimp" with "trafficker."

"This court reviews preserved objections to evidentiary rulings for abuse of discretion, subject to the harmless error standard." *United States v. Valas*, 822 F.3d 228, 239–40 (5th Cir. 2016). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Portillo*, 969 F.3d 144, 168 (5th Cir. 2020) (quoting *United States v. Insaulgarat*, 378 F.3d 456, 464 (5th Cir. 2004)). "In criminal cases, the court's 'review of evidentiary rulings . . . is necessarily heightened,' and the court should ensure that the evidence is 'strictly relevant to the particular offense charged.'" *Id.* (quoting *United States v. Anderson*, 933 F.2d 1261, 1268 (5th Cir. 1991)).

"Non-preserved evidentiary issues are reviewed for plain error." *Valas*, 822 F.3d at 240. Under plain error review, a party must show "(1) a forfeited error; (2) that was plain (clear or obvious error, rather than one subject to reasonable dispute); and (3) that affected his substantial rights." *Wallace v. Mississippi*, 43 F.4th 482, 496 (5th Cir. 2022).

#### *1. Improper Bolstering or Vouching Testimony*

Lewis argues that the government elicited testimony from Clemmons and Larson that "improperly vouched for the testimony of the sex worker witnesses by . . . repeating out-of-court statements by those witnesses." "When bolstering testimony suggests to the jury that it may shift to a witness

the responsibility for determining the truth of the evidence, its admission may constitute reversible error." *United States v. Price*, 722 F.2d 88, 90 (5th Cir. 1983); *see also United States v. McFadden*, 116 F.4th 1069, 1096 (10th Cir. 2024) (explaining the "court uses the terms 'vouching' and 'bolstering' somewhat interchangeably when referring to expert testimony or prosecutorial statements that express belief or opinion regarding a witness's credibility" (citation modified)). Relevant here, we have recognized that "[t]estifying officers may provide context for their investigation or explain 'background' facts." *United States v. Kizzee*, 877 F.3d 650, 659–60 (5th Cir. 2017). "Such out-of-court statements are not offered for the truth of the matter asserted therein, but instead for another purpose: to explain the officer's actions." *Id.* Lewis challenges four categories of testimony.

**a. Clemmons's testimony of prior statements made by B.E. and K.B.**

First, Lewis points to instances in which Clemmons testified to statements B.E. and K.B. made during interviews that Clemmons conducted as part of her investigation. He highlights Clemmons's testimony that B.E. indicated that "she engaged in commercial sex" at the defendant's direction and "provide[d] accounts of . . . use of threats or force," and testimony of her interview with K.B. where K.B. described physical abuse by the defendant. Because Clemmons testified before B.E. and K.B., Lewis argues these statements "primed the jury to find those witnesses credible." Lewis did not adequately object to these portions of testimony, so plain error review applies.[8] But Lewis does not identify any Fifth Circuit precedent establishing

[8] Lewis points to an objection he made surrounding these statements, but a review of the record reveals that his objection was to questions referring to "threats of force" and being "forced to engage in commercial sex via force, fraud, or coercion" because these are "real legal terms" that call for "a legal conclusion." This was not sufficiently specific to alert the district court to the alleged error of repeating witness statements. *See United States v. Johnson*, 943 F.3d 214, 221–22 (5th Cir. 2019). Furthermore, this objection was

that Clemmons's testimony of B.E. and K.B.'s prior statements constituted impermissible bolstering. Instead, Lewis cites to *United States v. Price*, 722 F.2d 88, 90 (5th Cir. 1983); *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007); and *United States v. Sosa*, 897 F.3d 615, 621 (5th Cir. 2018). In *Price*, we found an IRS agent testifying for the government offered improper bolstering testimony when he stated "that he believed" statements made by two other government witnesses. 722 F.2d at 89. But we have since explained that *Price* "prohibited only an *express* statement by the expert that he believed the government's witnesses." *United States v. Moore*, 997 F.2d 55, 59 (5th Cir. 1993); *see also United States v. Chikere*, 751 F. App'x 456, 461 (5th Cir. 2018) (same). Here, Clemmons did not make such an express statement. The other examples of improper bolstering testimony to which Lewis cites are similarly distinguishable. *See United States v. Smith*, 814 F.3d 268, 275 (5th Cir. 2016) (a prosecutor's argument "offer[ing] the integrity of the prosecutor . . . as a reason to disbelieve" a witness); *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007) (summary witness's introduction of "evidence that the jury has not previously heard"). Therefore, we find that Clemmons's testimony of B.E. and K.B.'s statements during interviews was not improper bolstering.

**b. Clemmons's testimony that she could corroborate B.E.'s experience**

Second, Lewis highlights Clemmons's testimony that she "corroborate[d]" B.E.'s story. In the exchange, the prosecutor asked Clemmons what investigative steps she attempted to take to corroborate B.E.'s story following her interview, and whether Clemmons was able to corroborate or find evidence of B.E.'s experience with Lewis in T.A.'s Dropbox. Lewis

---

sustained, and the court instructed the jury to strike the question using legal terms. The prosecution then asked about "threats or force," again, but just after Clemmons answered, the defense objected, and the prosecution rephrased to "physical abuse."

objected and thus preserved this error. On appeal, he relies on *United States v. Francis*, 170 F.3d 546 (6th Cir. 1999). But *Francis* suggests the testimony was permissible: "A prosecutor may ask a government agent or other witnesses whether he was able to corroborate what he learned in the course of a criminal investigation," but if he does so, he "must also draw out testimony explaining how the information was corroborated and where it originated." 170 F.3d at 551; *see also United States v. Rosario-Diaz*, 202 F.3d 54, 65 (1st Cir. 2000) (explaining that an agent "could properly have testified as to the actions he took to corroborate [witness's] testimony," but "could not properly opine on whether particular statements by [witness] were 'lies,'" or that other statements had been "verified through interrogation techniques"); *Lam v. Kelchner*, 304 F.3d 256, 272 (3d Cir. 2002) (same). Under this framework, the prosecution's questions about specific steps Clemmons took to corroborate B.E.'s story did not constitute improper bolstering.

**c. Larson's testimony that T.A. described being abused and forced to engage in commercial sex by Lewis**

Third, Lewis challenges Larson's testimony of prior out-of-court statements made by T.A. describing: (1) physical abuse by Lewis, and (2) how she was "made," and "compelled," to engage in commercial sex by Lewis. The defense objected to this questioning, and the court appears to have concluded that it was admissible as a prior consistent statement to rehabilitate T.A., who testified before Larson and was impeached based on the benefits she received from the government. On appeal, Lewis does not address why the testimony was not admissible as a prior consistent statement beyond pointing to his objection that "the government was not simply offering a prior 'specific statement' and was instead eliciting testimony on the broader issue of whether Lewis forced [T.A.] into trafficking." But the district court responded to the objection by instructing the government to "tighten up your question" to "[w]hat she specifically said." And the

prosecution did so.[9] In the absence of any meaningful challenge to the admission of the testimony as a prior consistent statement, we find that the district court did not abuse its discretion in permitting Larson's testimony.[10]

**d. Testimony about benefits received by the victims**

Fourth, Lewis argues that "the government elicited testimony that improperly vouched for the sex worker witnesses by discussing benefits received by those witnesses." Specifically, he takes issue with S.W.'s testimony about a plea agreement in an unrelated case and early release after cooperating against Lewis, and Clemmons's testimony about benefits the government gave to T.A. In response to the government's argument that he opened the door to this testimony, Lewis argues he did not reference the *specific* testimony he challenges.

"It is well-settled in this Circuit that a defendant may not complain on appeal he was prejudiced by evidence relating to a subject which he opened up at trial." *United States v. Age*, 136 F.4th 193, 222 (5th Cir. 2025) (citing *United States v. Kiekow*, 872 F.3d 236, 252 (5th Cir. 2017)), *petition for cert. filed* (Aug. 28, 2025) (No. 25-5533). "[C]ounsel may not mislead the jury or convey an erroneous impression without opening the avenue for cross-interrogation for purposes of clarification." *United States v. Ruppel*, 666 F.2d 261, 269 (Former 5th Cir. Unit A 1982). And "the government may 'blunt the

---

[9] The government restated its question as: "So pointing you specifically to that interview, before there was a baby, before there were benefits, in her statements from that interview do you remember her saying anything about times when -- if -- if there were any times she felt compelled to go out and commit commercial sex acts?"

[10] Additionally, there is at least some basis for admitting the testimony as a prior consistent statement: T.A. had already testified and was impeached based on benefits she received since her initial interview. *See United States v. Quinn*, 826 F. App'x 337, 339 (5th Cir. 2020) (explaining the criteria for when a prior consistent statement "can be used not just for impeachment but also as substantive evidence"); FED. R. EVID. 801(d)(1)(B).

sword' of anticipated impeachment by revealing the information first." *United States v. Roland*, 130 F.4th 480, 486 (5th Cir. 2025) (quoting *United States v. Coleman*, 997 F.2d 1101, 1105 (5th Cir. 1993)), *cert. denied*, 2025 WL 2824449 (Oct. 6, 2025).

Lewis first points to testimony the prosecution elicited from S.W. about a plea agreement she entered for charges unrelated to this case, wherein she received a reduced sentence as a result of her cooperation against the other defendants in that case, and S.W.'s testimony about being released early after cooperating against Lewis. Lewis also highlights that on redirect examination, S.W. answered affirmatively to the prosecution's question of whether her prior cooperation resulted in "putting bad guys in jail."

"Admission of a plea agreement wherein the witness has agreed to testify truthfully or face prosecution for perjury is not impermissible bolstering of the witness." *United States v. Edelman*, 873 F.2d 791, 795 (5th Cir. 1989). But "prosecutors are not permitted to bolster a witness's credibility by implying that the prosecutor, or even worse the neutral judge, has determined the testimony to be truthful." *United States v. Sosa*, 897 F.3d 615, 621 (5th Cir. 2018); *see also id.* at 621–22 (collecting cases).

Assuming arguendo that the prosecution's statement that S.W. had "put bad guys in jail" impermissibly suggested that he, and either a judge or jury, found her prior cooperation trustworthy, the question now becomes whether this bolstering affected Lewis's substantial rights. "To gauge the effect to [Lewis's] substantial rights, we must consider '(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt.'" *See United States v. Ramirez-Velasquez*, 322 F.3d 868, 875 (5th Cir. 2003) (quoting *United States v. Tomblin,* 46 F.3d 1369, 1389 (5th Cir.1995)). "The magnitude of prejudicial effect is measured by 'looking at the prosecutor's remarks in

the context of the trial in which they were made and attempting to elucidate their intended effect.'" *Id.* (quoting *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996)). Here, the remark was not "so pronounced and persistent" as to "permeate the entire atmosphere of the trial." *Id.* For one, the focus of that portion of S.W.'s redirect examination was to defend and explain her omission of Lewis when she cooperated in the other case, an omission the defense highlighted in her cross examination. Second, the prosecution did not mention her cooperation in its closing argument, further demonstrating that this remark was not persistent in the trial. *See Sosa*, 897 F.3d at 622 (explaining that an additional obstacle to the substantial rights hurdle was that "the bolstering was not repeated during closing argument when it can be most potent").

As to the second factor, cautionary instructions, the judge informed the jurors that they must be the "the sole judges of the credibility or believability of each witness and the weight to be given to the witness' testimony." We find such instruction helped to mitigate any prejudicial effect of the statement. *See United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999) ("In addition, the district court helped to mitigate any prejudicial effect by instructing the jury to base their decision solely upon the testimony and evidence presented."); *Sosa*, 897 F.3d at 622 (explaining that an additional obstacle to the substantial rights hurdle was that the jury was instructed that it "alone must evaluate witness credibility").

Finally, in light of our review of Lewis's sufficiency of the evidence claims, we find that this one remark by the prosecution during a redirect examination does not outweigh the strength of the evidence of Lewis's guilt.

Thus, Lewis failed to establish plain error by the district court for permitting S.W.'s testimony about her cooperation in an unrelated case.

Lewis also argues that Clemmons's testimony about "benefits the government dispersed to [T.A.] . . . improperly bolstered [T.A.'s] reliability because it gave the impression the government had already found [T.A.] credible." Lewis points to Clemmons's testimony that she persisted in following up with T.A., because "she was a victim . . . and I wanted to bring some kind of justice to her experience." But the defense opened the door to this testimony in its opening statement, arguing that "investigators were giving gifts as recent as months ago." Moreover, some of the testimony Lewis points to on appeal was elicited during the defense's cross-examination of Clemmons. Lewis did not object to this testimony and does not point to any authority to establish that this constitutes improper bolstering rather than proper background on the investigation. Accordingly, Lewis again failed to establish plain error.

### *2. Equating "Pimp" with "Trafficker"*

Lewis argues that Clemmons's testimony, wherein she interchangeably uses the terms "pimps or traffickers" when referring to her investigation subjects, was an impermissible legal conclusion that undermined the jury's role. We disagree. The district court did not abuse its discretion because the "description of the jargon [Clemmons] uses in her day-to-day work did not improperly invade the province of the jury." Clemmons's statement was more akin to an "explanation of [her] analysis of the facts which would tend to support a jury finding on the ultimate issue," *see United States v. Keys*, 747 F. App'x 198, 208 (5th Cir. 2018) (citation modified) (quoting *United States v. Buchanan*, 70 F.3d 818, 833 n.20 (5th Cir. 1995)), than an impermissible "opinion [that] merely tell[s] the jury what result to reach," *see United States*

*v. Oti*, 872 F.3d 678, 692 (5th Cir. 2017) (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992))).[11]

In sum, the admission of the challenged expert testimony by the district court was not reversible error.

### D. Social Media Evidence

Finally, Lewis argues the district court abused its discretion in admitting four Instagram posts during Larson's direct examination over the defense's objection. The timing of the posts overlaps with the charges involving S.W. Lewis argues that (1) none of the posts were properly authenticated under Rule 901, and (2) two of the posts were inadmissible under Rules 404(b) and 403.

#### *1. Authentication under Rule 901*

The parties agree that Lewis preserved the authentication issue. "Authentication is a condition precedent to the admission of evidence and is satisfied when a party presents evidence sufficient 'to support a finding that the item is what the proponent claims.'" *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (quoting FED. R. EVID. 901(a)). "A proponent may authenticate a document with circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery." *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (citation

---

[11] Regardless, any error in admitting the statement was harmless because there is no argument or indication that the statement had any bearing on the substance of the decision reached, and we determined above that there was substantial evidence to support the conviction. *See Chamber of Com. of U.S. v. U.S. Sec. and Exch. Comm'n*, 85 F.4th 760, 779 (5th Cir. 2023) ("Under the harmless-error doctrine, a challenged rule survives judicial review notwithstanding error only if such error 'clearly had no bearing on the procedure used or the substance of the decision reached.'" (quoting *Sierra Club v. U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001))).

modified). "The standard for authentication is not a burdensome one." *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011).

Other circuits have explicitly held that "the Government may authenticate social media evidence with circumstantial evidence linking the defendant to the social media account." *United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021) (relying on the Third and Seventh Circuits). We have done so implicitly, finding Facebook messages were adequately authenticated by testimony that a witness "had seen [the defendant] use Facebook, she recognized his Facebook account, and the Facebook messages matched [the defendant's] manner of communicating." *Barnes*, 803 F.3d at 217; *but cf. id.* at 218 (reasoning that "regardless, any potential error . . . was harmless").

Here, the Instagram posts were sufficiently authenticated by Larson's testimony coupled with T.A.'s testimony. Larson testified to finding an Instagram account with the username "larrylavish" by searching Lewis's name and nickname Lavish. He testified that the account contained "quite a few" posts showing Lewis over a two-year period, in places that would be accessible only to Lewis "[l]ike the house," and taken in selfie mode, prompting Larson to conclude it was Lewis's account. Larson testified that he got a search warrant for the account, and Instagram disclosed posts from the account from 2016 to 2017.

T.A. testified that Lewis posted to an Instagram account with the same username, "larrylavish." Lewis argues that the government cannot rely on T.A.'s testimony to authenticate the posts because her testimony concerned an account that existed in 2014–2015, and the district court found that the challenged exhibits came from an account that was created in 2016. This account creation date discrepancy explains why the search warrant that produced the Instagram posts at issue here did not produce the earlier posts introduced during T.A.'s testimony. Even so, T.A.'s testimony that Lewis

posted to an Instagram account with the username "larrylavish" provides at least some additional evidence to support that he authored the challenged posts under the same username.

Together, the testimony of Larson and T.A. was sufficient to authenticate the Instagram posts; thus, the district court did not abuse its discretion by admitting the posts.

### *2. Extrinsic Bad Acts and Prejudice under Rules 404(b) and 403*

Lewis also argues that two of the Instagram posts depicting memes related to pimping were inadmissible under Federal Rules of Evidence 404(b) and 403.[12] Specifically, he argues these posts were impermissible extrinsic evidence under Rule 404(b) because the "memes did not form part of Lewis's attempt to persuade any sex worker to work as a prostitute or to travel interstate for that purpose." The government argues that the posts were intrinsic evidence "relevant to show that [Lewis] acted with the necessary knowledge and intent." The district court appears to have admitted the posts as intrinsic evidence of Lewis's intent. The parties agree Lewis preserved this error.

"Rule 404(b) only applies to limit the admissibility of evidence of extrinsic acts"; "[i]ntrinsic evidence, on the other hand, is generally admissible 'so that the jury may evaluate all the circumstances under which the defendant acted.'" *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007)

---

[12] The memes depict two separate scenes. One features a standing man with a watering can for a head pouring water onto a seated woman with a flower pot for a head, with text overlaid stating "[s]oak her brain wit some game," "[r]un game in her [n]ot on her," and "[h]elp yo bitch 'grow.'" The poster commented "U digg what im sayin...." The second meme depicted a fictional scene comprised of various photographs of former President Obama and his wife, Michelle Obama, ending with former President Obama saying that he will "fuc[k] this [b]itch up" because Michelle had not posted her ads soliciting commercial sex. The poster commented "Frfr," meaning "for real for real."

(citation modified) (quoting *United States v. Royal*, 972 F.2d 643, 647 (5th Cir. 1992)).

We agree with Lewis that the memes were not intrinsic evidence. "Evidence of an act is intrinsic when it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or it was a necessary preliminary to the crime charged." *Sumlin*, 489 F.3d at 689. Because, here, there is no evidence that Lewis used Instagram to force or entice women to engage in commercial sex, the memes are not so "inextricably intertwined" with the offense as to be intrinsic evidence. *See United States v. Alfred*, 982 F.3d 1273, 1280–82 (10th Cir. 2020) (reasoning memes related to pimping could be intrinsic evidence where defendant used social media to solicit at least one user to engage in prostitution and the "photos were available to those he was trying to recruit"). Thus, the district court was incorrect in stating that the memes were intrinsic evidence, and we must determine whether the district court abused its discretion by admitting that evidence under Rule 404(b).

Evidence of a defendant's "other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). We apply "a two-prong test for determining if evidence of a defendant's prior wrongs is admissible under Federal Rule of Evidence 404(b): such evidence is admissible only if (1) it is relevant to an issue other than the defendant's character, and (2) its probative value is not substantially outweighed by undue prejudice to the defendant, and the evidence meets the other requirements of Rule 403." *United States v. Williams*, 620 F.3d 483, 488 (5th Cir. 2010) (citing *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)).

The government argues that the posts were "relevant to the jury's determination of whether [Lewis] knew that 'force, fraud, or coercion' would be used to cause his victims to engage in a commercial sex act." Lewis counters that images depicting "support for prostitution or pimping [do] not involve the same state of mind as using force or coercion to compel prostitution or interstate travel for purposes of prostitution." But a jury could reasonably find that both posts go beyond showing support for pimping and suggest some level of control over the women being pimped. Alternatively, even assuming the memes depict support for pimping—not controlling sex workers—the Coercion and Enticement counts only required the government to show persuasion, inducement, or enticement. Accordingly, the memes are relevant to the issue of whether Lewis knowingly forced or coerced women to engage in commercial sex—a proper non-character issue. *See United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) (explaining "uncharged offense is relevant to intent, a proper non-character issue under Rule 404(b), if it 'requires the same intent as the charged offense,' because evidence of the uncharged offense then 'lessens the likelihood that the defendant committed the charged offense with innocent intent'" (quoting *Beechum*, 582 F.2d at 913)).

As to the second prong, Lewis argues that the probative value of the memes was substantially outweighed by the risk of unfair prejudice because they contained inflammatory depictions of profanity, violence, and political figures that were likely to incite the jury to make an irrational decision. "'We consider several factors' in answering this question: '(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions.'" *Smith*, 804 F.3d at 736 (quoting *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013)). Here, (1) whether Lewis knowingly forced or coerced the women to engage in commercial sex, or whether they did so of their own volition, was the primary issue at trial, (2)

the depictions of pimping are closely related to the charged offense, (3) the posts overlap with the timeframe of the count involving S.W., and (4) the jury received the pattern jury instruction limiting the use of evidence of "similar acts." Thus, the probative value of the posts was not substantially outweighed by the risk of unfair prejudice. *See United States v. Rojas*, 812 F.3d 382, 405 (5th Cir. 2016) (holding that because "evidence was highly probative on the element of intent, it was not an abuse of discretion for the district court to conclude that it satisfied Rule 403's balancing test").

We therefore conclude that it was not an abuse of discretion for the district court to admit the two Instagram posts depicting pimping memes.

## III. Conclusion

Finding no reversible error, we AFFIRM the district court's denial of Lewis's motion for judgment of acquittal, denial of Lewis's motion for a mistrial or to strike the testimony of two government witnesses, admission of testimony, and admission of Instagram posts. The judgment of conviction is AFFIRMED.